THE CITY OF DETROIT v. JAMES W. DALY ET AL.

*Condemnation proceedings—Detroit city charter—Opening street—*
*Damages—Verdict of jury—Necessity of improvement—*
*Assessment of benefits—Taxing district.*

| 68 | 503 |
|----|-----|
| 68 | 638 |
| 69 | 16 |
| 69 | 165 |
| 69 | 167 |
| 75 | 460 |
| 68 | 503 |
| 76 | 517 |
| 68 | 503 |
| 92 | 94 |
| 92 | 273 |
| 92 | 570 |
| 68 | 503 |
| 97 | 600 |
| 68 | 503 |
| 99 | 445 |
| 68 | 503 |
| 139 | 4 34 |

1. The provisions of the charter of the city of Detroit authorizing the jury in condemnation cases to give a lumping verdict, deducting from the proper damages the enhanced value by benefits given to the owner's land *not* taken, and authorizing the city to determine in advance an assessment district, including the property which it may deem benefited, and providing that any compensation or damages shall be apportioned one-half against the city at large and one-half against the property benefited, are not sufficiently guarded, and as to a part at least are entirely without legal safeguards.

2. The Constitution does not allow property to be condemned unless there is a *public* necessity for it, and this must be a *real* necessity, without which private citizens cannot be disturbed in the enjoyment of their freeholds in their own way.

3. In estimating the necessity for taking private property for public purposes, it can make no difference to the public who owns the land. If it is necessary to take it, that necessity must be as great where it is owned *separately* as where it is part of a *larger* property; in which *latter* case the public have no right to force its sale for less than its *independent* value.

4. Every valid assessment must be based on some legally ordained basis of apportionment, and not arbitrarily. The charge, whether based on supposed benefits or any other legal burden, must be spread over the taxing district according to some uniformly applied rule, and in such a way as to show a compliance with that rule, whatever it may be.

5. There *may* be a necessity of leaving considerable discretion to the authorities who fix a taxing district, if it can be made to differ from the ordinary municipal subdivisions; but it cannot be such an *uncontrolled* discretion as to leave no public character whatever to the district, and make a purely *private* charge under pretense of setting off an assessment district.

6. It is elementary that no one can be lawfully made to bear more than his share of any public burden, and *that* share must be assessed by some tangible process of distribution.

7. The only theory on which the doctrine of charging the expense of public works on property benefited can be maintained is that if local improvements can be conveniently paid for by local assessments, in this way, in the long run, the general public may be charged for the general result with approximate equality. Any other theory of benefits involves the taking of private property for private use, and is unfair and unauthorized. The whole public, or the allotted district, or both, must pay for *all* that the public appropriates.

8. If one person is charged for more benefit than another, it must be because by the rule of apportionment his share is greater in the assessment ; but he can only be obliged to pay his share, and must have the means furnished him by the proceedings of knowing *exactly* what his share is; and this cannot be done unless there is a *separate* finding of the value of the property taken and of the enhanced value of *all* the parcels of property within the district, so that the percentage of each owner can be easily calculated, as in the case of any other tax or assessment.

9. There may be cases where the damage to property, by the establishment of a public way, includes *more* than the mere value of the land taken; but there can be no case where the price paid by the public can lawfully be any *less* than the value of the property taken.[1]

Appeal from recorder's court of Detroit. (Swift, J.) Argued October 13, 1887. Decided March 2, 1888.

Appeal from order confirming a verdict in a street-opening case. Proceedings quashed. The facts are stated in the opinion.

*Corliss, Andrus & Leete,* for appellants.

*John W. McGrath,* city counselor, and *William S. Sheeran,* city attorney, for petitioner.

CAMPBELL, J. The city of Detroit carried through proceedings in the recorder's court to open Riopelle street, one of its north and south streets, from its existing northern

---

[1] See *Weber v. Stragray,* 75 Mich. 33 (head-note 4), holding that a failure to allow damages to the value of land for *farming* purposes, taken for a highway, will prevent the public acquiring any rights or interest in the property condemned.

terminus on Farnsworth street northerly to Ferry street, a distance of 1,050 and 54-100 feet in length, and 60 feet in width, condemning for that purpose not far from an acre and a half of city property. The extension ran through a solid block of land about 338 feet wide, all of which was owned in a body by James E. and George H. Scripps, except a small part at the south end owned by Daly and Jerome.

The property through which the street was proposed to be run is a block of rather less than 10 acres, with a width of 338 feet by 1,050 feet. As left by the street opening it leaves two parcels of the same depth and 139 feet wide, one of which is detached from the other and incapable of use with it. The testimony of competent witnesses decidedly predominates in favor of its being more valuable as a single manufacturing lot than in two smaller ones, and that it could only be made available if so divided by further subdivision into small lots, the sale of which is not in demand. The value of the street parcel is placed by most of the testimony at from $3,700 to $6,000, and nowhere less than $3,000.

The testimony of any existing necessity is confined entirely to the convenience of the Peninsula Car Works on the north side of Ferry street, and of the lots on Riopelle street southward. There is no testimony fixing any value of benefits to the car company's lot, and none fixing them very high on the southerly lots. There is no testimony showing that the extension of Riopelle street northward would be necessary to furnish these lots an outlet, and practically the only benefit which the witnesses seem to have regarded was that which would accrue to Messrs. Scripps by cutting up their land so as to spoil it for the uses they have destined it for.

The jury were instructed to find the full value of land taken where the whole of a lot was taken; but where part was taken and part left, they were to apply the advantage caused by the street on the value of the land taken, and give only the resulting balance, if any, as damages, not showing,

however, what they allowed, for the value of the land, and how much was deducted.   Beyond this, they were to assess on the property left its share of the benefits to the assessment district.   The result of this process was that the jury found that for the Scripps land no damage should be allowed, but furthermore assessed against it $115, or about one-fourth of the entire benefits assessed, which amounted to $450, of which the city paid half.   All of the benefits assessed were adjudged to Daly and Jerome for so much of their land as was taken, and they were charged $15 for their share of the benefits.   The assessment district was made to include a parcel of the whole width of the Riopelle farm, 171 feet deep, lying on the north side of Ferry street (the middle of which was opposite the north end of the extension of Riopelle street), and, in addition to this, the Scripps, Daly, and Jerome property, and three tiers of lots, or a block and a half, on either side of Riopelle street as already existing. The lot north of Ferry street, belonging to the Peninsular Car Company, was assessed $25, and the thirty lots south of Farnsworth street, in the blocks lying on Riopelle street, were assessed $50, or $1.66 each.

The result of all this was not only that the Scripps property was taken without compensation, but they were assessed $115 for the privilege of having it taken.   They appeal on various grounds, involving, among other things, the right to allow such results to be reached.   The injustice of the finding is so monstrous that we should have no hesitation in setting it aside under the general power given us to review such proceedings.   But as important principles are involved, coming within a considerable body of our decisions which have been completely disregarded, we are called on to refer again to some of the rules of law which control or should control these proceedings.   They have been announced so often that we do not think it necessary to cite the authorities by name. Many of them were cited by counsel.   And as we are required.

to consider the verdict and proceedings on the merits on the appeal, as has always been done in disposing of such special proceedings, we cannot confine our view to dry questions of law, but must look to substantial justice.

The charter, which differs in this respect from the State laws governing similar proceedings elsewhere, does. provide expressly that the jury may give a lumping verdict, deducting from the proper damages the enhanced value by benefits given to the owner's land not taken. It also provides that the city may determine in advance an assessment district, including the property which it may deem benefited, and that any compensation or damages shall be apportioned half against the city at large and half against the property benefited. These provisions are not sufficiently guarded, and as to a part at least are entirely without legal safeguards. A simple comparison of facts, according to the testimony given, will show how easily the provisions of the charter may be perverted to mischief.

Ostensibly, and probably in the view of the Legislature, who would certainly not designedly deprive land-owners in Detroit of the rights enjoyed by them elsewhere, the theory of street opening is this: No street shall be opened unless the benefit to the public is equal to the value of the property taken, and half of that value shall be paid by the whole city, and the other half shall be apportioned on the property in that part of the city directly benefited in proportion to the benefits. If the general and local benefits do not equal the value of the property taken it cannot be taken. The Constitution does not allow property to be condemned unless there is a public necessity for it, and this must be a real necessity, without which private citizens cannot be disturbed in the enjoyment of their freeholds in their own way.

Leaving out the supposed advantage to appellants, it cannot be said that there is a respectable showing of any conceivable necessity, and it certainly cannot be held with any

regard to common sense that there is a public necessity for improving the private property of these parties against their will. This cannot be lawfully done. But to get at the money standard, we must look at the value of the property taken. This, at the lowest figure, would be, as to all the appellants, considerable over $3,000, and a verdict could hardly be sustained on the testimony which should place it as low as that. Unless the public benefit exceeds that sum there can be no necessity. In estimating the necessity it can make no difference to the public who owns the land. If it is necessary to take it, that necessity must be as great where it is owned separately as where it is part of a larger property. If this strip were to be sold separately, it would be worth several thousand dollars. The public have no right to force its sale —for that is the legal effect of condemnation, and it is so called expressly in the civil law, from which our doctrine of eminent domain is borrowed—for any less than its independent value. If this value were found separately, the charter requires the greater public of the city to pay half, and the lesser public of the assessment district to pay the other half. If, as is usual, the neighboring land is in that district, it must pay its share of the benefit to the lands in that district. But this share is in the nature of an assessment, which this statute requires to be made by a jury in connection with the condemnation, but which, under the general law of 1883, is made, as it certainly can be better made, after the property is condemned, by the ordinary assessing officers, thus preventing the anomaly of different official valuations of the same property. Every valid assessment must be based on the legally ordained basis of apportionment, and not arbitrarily. The charge, whether based on supposed benefits or any other legal burden, must be spread over the taxing district according to some uniformly applied rule, and in such a way as to show a compliance with that rule, whatever it may be. This doctrine has been settled by a large number of

cases in this Court. Under this statute only half of the cost or damages can be levied on the district declared to be specially benefited. If it could all be laid on the district, and if the district could be made as small as the one before us, it would be ridiculous to speak of the improvement as one of public necessity, when there is really no public whatever.

There may be a necessity of leaving considerable discretion to the authorities who fix a taxing district, if it can be made to differ from the ordinary municipal subdivisions; but it cannot be such an uncontrolled discretion as to leave no public character whatever to the district, and make a purely private charge under pretense of setting off an assessment district. While it is quite possible that a municipal subdivision would not be an appropriate territory to charge with the special improvement, yet, on the other hand, if the matter could be left to the pure caprice of the city authorities, it is evident that there would be no equality in public burdens. No case could show more plainly the danger of such an abuse than this record shows it. Here it is evident that the district could not by any imaginable theory receive as a district anything approaching half of the value of the land taken. We had occasion in *Clay v. Grand Rapids,* 60 Mich. 451 (27 N. W. Rep. 596), to refer to the illegality of making a private property of small extent assume the name of an assessment district.

By the ingenious process followed in this case, what is claimed to be the public has obtained several thousand dollars' worth of property for half of the price, of which the city pays only $225, or not more than 10 per cent. of the real value, while the appellants have been made to pay ninetenths of the whole of it, when, if they had been made to bear even the whole charge laid on the assessing district, they could only be charged with half of the value.

It is elementary that no one can be lawfully made to bear

more than his share of any public burden, and that share must be assessed by some tangible process of distribution. This district, under the law, is subject to the rule that one-half of the improvement should be paid by the district, and this must be divided in money burdens on some fair money basis.

The only theory on which the doctrine of charging the expense of public works on property benefited can be maintained is that if local improvements can be conveniently paid for by local assessments, in this way, in the long run, the general public may be charged for the general result with approximate equality.   Any other theory of benefits involves the taking of private property for private use, and is unfair and unauthorized.   The whole public, or the allotted district, or both, must pay for all that the public appropriates.   If one person is charged for more benefit than another, it must be because by the rule of apportionment his share is greater in the assessment; but he can only be obliged to pay his share, and must have the means furnished him by the proceedings of knowing exactly what his share is.   Otherwise the charge may be arbitrary.

This cannot be done unless there is a separate finding of the value of the property taken and of the enhanced value of all the parcels of property within the district, so that the percentage of each owner can easily be calculated, as in the case of any other tax or assessment.   It cannot be got at in any other way.   There may be cases where the damage to property, by the establishment of a public way, includes more than the mere value of the land taken; but there can be no case where the price paid by the public can lawfully be any less than the value of the property taken.   If this strip would be worth several thousand dollars to one owner, who owns no more, it is because it would probably sell for that. It would sell for just as much if owned by appellants, and there is no sense in saying it is worth any less to the public

in the one case than in the other, and no jury can properly find otherwise. If the adjoining land were owned by different owners it would be just as much benefited as if owned by the same owners in similar parcels, and the benefits should be apportioned accordingly. But when the jury are allowed to make the offset, and declare damages and benefits equal, without specifying the amount, the result, as shown here, is to make the owner bear the whole burden, and relieve the city and his neighbors of their legal shares of the expense.

So much of the charter as requires such a process is illegal, and should be disregarded.

This question is the most important one urged on the argument. But on the facts it is plain that there was not only no fair apportionment of damages and benefits, but that there was no necessity made out. There is no reason to believe that the jury would have found in favor of the street opening if they had supposed the city should be charged with half of the real damages.

It is much to be regretted that attempts should be made to put Detroit on a different footing from other cities in the appropriation of private property, and that the law, such as it is, should be perverted by verdicts like the present. The act of 1883 was designed to put all cities on the same footing, although it allows every city to choose, in any case, whether to follow its own special charter or regulations, or use the general statute. There is manifest injustice in having different rules in the same city, and great risk of injustice in having radically different systems at all. But the duty exists under both sets of laws to guard against attempts to serve merely private purposes under the guise of public condemnations.

These proceedings must be quashed entirely. Apart from the legal difficulties pointed out, it appears plainly that there is no public necessity for opening this small length of street.

The proceedings must be quashed, with costs to the appelants.

CHAMPLIN and MORSE, JJ., concurred.

SHERWOOD, C. J.   So long as it shall remain the law of the State that, when the private property of a person is taken for public use as a street, the compensation, in whole or in part, to be made therefor may be made to consist of such benefits arising from the making of the street as twelve of the owner's neighbors may be induced to believe, by means as likely to be wrong as right, will accrue to him if he will but make such use of the land as to avail himself of them, I shall feel obliged to agree with the opinion filed in this case by my brethren.

But I cannot believe that the framers of our Constitutions, either State or National, which provide that private property shall not be taken for public use without just compensation therefor, and that "private property shall not be taken for public improvements in cities and villages * * * unless the compensation therefor shall first be paid," ever anticipated that such compensation could be made up of benefits to the owner entirely speculative in character, the value of which should be estimated by persons whose pecuniary interests would induce them to place the lowest possible value upon the property to be taken, and the highest appraisal on the benefits claimed.

The compensation intended by these provisions of our Constitutions is the fair cash market value of the property to be taken, and the payment intended is required to be in the legal currency of the country, and it should make no difference what incidental benefits the owner may be thought to derive.

His property can never, in my judgment, be taken for public use without making such compensation and payment to him therefor.

The Constitution does not allow the Legislature to compel the citizen to exchange his homestead for the benefits it is thought he may derive,for the privilege of using a street in common with the rest of the community, but which he does not want,and which he deems an actual damage to him. And I have always regarded our law, which permits this to be done, as unconstitutional, and I do not think it needs argument or authority to show the conflict. The benefits he receives, which can be considered by the public, are common to all interested, and he can only be lawfully taxed equally with them for the improvement.

I have heretofore given a *quasi* acquiescence, with a protest, whenever the question has been presented in the decisions given, in the hope that the Legislature would repeal this obnoxious provision. This, however, has not been done, and I believe the time has arrived when this Court should cease to enforce this unconstitutional enactment against property owners in our State, and rid our people of the expensive litigation, wrong, and oppression it seems necessarily to involve in almost every case where its enforcement is attempted.

Not only for the reasons herein given, but also for those stated by my Brother CAMPBELL, I think the proceedings should be quashed, with costs to appellants.